IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DEVINA MILLS, individually and on behalf of
all others similarly situated,

        Plaintiff,                Case No. 8:18-cv-00855-CEH-TGW

   v.

GENERAL DYNAMICS INFORMATION
TECHNOLOGY, INC.,

        Defendant.

_____/

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO CONDITIONALLY CERTIFY AN FLSA COLLECTIVE ACTION AND AUTHORIZED NOTICE TO PUTATIVE OPT-IN PLAINTIFFS

## I.    INTRODUCTION

Alice Velazquez, the single named, but yet-to-be substituted Plaintiff[1] formerly employed as a Customer Service Representative ("CSR") on General Dynamics Information Technology, Inc.'s ("GDIT") Contact Center Operations ("CCO") contract seeks conditional certification of a Fair Labor Standards Act ("FLSA") collective action and permission to send a notice to "all similarly situated current and former" CSRs "throughout the United States who worked for Defendant . . . from three years preceding the filing of this action (April 10, 2015) to July 31, 2017 (the 'Material Period') regarding their opt-in rights . . . ."[2]   [Doc. 89 at 1, 2].

---

[1] Plaintiff's counsel has moved for leave to file a Second Amended Complaint removing Mills as the lead plaintiff and substituting Alice Velazquez ("Velazquez"), a CSR employed in GDIT's Lynn Haven, Florida location, because Mills is no longer interested in pursuing this litigation.  GDIT's motion in opposition remains pending.

[2] The evidence relied upon by Plaintiff in support of her Motion pertains exclusively to the "CCO" contract. *See* [Docs. 89-1 through 89-18] (all of Plaintiff's declarants are current or former CCO employees); [Docs. 89-19]and 89-20] (manuals dealing with the Empower scheduling system, which is unique to CCO); [Docs. 89-21

As discussed herein, Plaintiff's submission fails to satisfy her burden that certification and notice are warranted because she cannot establish she is similarly situated to the class she seeks to represent.

The decision to grant conditional certification and authorize notice is not automatic and requires a thorough analysis.  Here, the proposed class members are not similarly situated, and clearly not so similar as to render them manageable as a class. There was no common policy or practice that violated the FLSA.  Plaintiff contends that GDIT paid CSRs based on the time they were logged into "Avaya," the telephone software application, which resulted in unpaid preliminary work of logging into the computer, loading essential software applications, checking emails, and consulting the calendar. [Doc. 89 at 5, 6, n.6].  CSRs were, in fact, compensated based on the time they themselves manually recorded on timesheets using GDIT's Electronic Timekeeping System ("ETS") and were instructed that their workday started when they first attempted to log into their computers or otherwise performed work.  *See* page 3-5, *infra*.

At most, Plaintiff's evidence shows that a small minority of CSRs were mistaken about how to record their time, and their misunderstanding can be traced to a handful of rogue Supervisors identified in Plaintiff's declarations. Absent a common unlawful policy or practice, a collective action would degenerate into individualized factual inquiries for each

---

and 89-25] (Avaya documents, which the headers show as CCO); [Doc. 89-22] (CCO job postings); [Docs. 89-23 and 89-24] (CCO contract); [Doc. 89-24] (CCO LMS job aid).  Indeed, all but five of the opt-in plaintiffs to date worked on the CCO contract.  [Ex. 2] Three of the opt-ins did not work for GDIT in any capacity on CCO or otherwise, and two of the opt-ins, Cynthia Speed and Linda Nelson, worked on two other contracts, which did **not** use the Avaya system. [Ex. 1, ¶14]; [Ex. 2].  Accordingly, this matter is necessarily limited to CCO CSRs.

plaintiff. Quite simply, Plaintiff has provided no evidentiary basis for conditionally certifying a class and issuing FLSA notice.

## II.    FACTUAL BACKGROUND

### A.    GDIT Trained CCO CSRs To Record All Hours Worked

GDIT operates call centers at various locations pursuant to different government contracts.[3] [Ex. 1, ¶8]. CSRs on the CCO contract answer phone calls to assist with questions and issues concerning Medicare or the Federally Facilitated Marketplaces. [Ex. 1, ¶12]. Every day they must complete an electronic timecard where they record all time worked, and then they submit the timecard on a weekly basis.  [Ex. 3, ¶1]. Supervisors approve CSRs' time cards but cannot make changes. [*Id.*]. Instead, Supervisors have to address any issues with the CSRs, who, in turn, make any required changes to the timecard. [*Id.*].

Over the years, CSRs received training on numerous occasions regarding their timekeeping responsibilities. [Ex. 1, ¶19]; [Ex. 3, ¶2]; [Ex. 4] (chart detailing the training received by Plaintiff and each opt-in).  Starting in May of 2014, this training included "Timekeeping 102," which instructed CSRs that they were required to accurately record their hours worked beginning with their "first work activity for the day." [Ex. 5 at 4].  Timekeeping 102 further instructed CSRs that "[y]our first work activity is usually starting up your computer (turning it on or unlocking it)."  [*Id.*]. The training offered examples of what constitutes work activity (such as logging into the computer) and what does not (such as getting coffee or stopping by the breakroom to put lunch in the fridge). [*Id.* at 5-9]. This training was in place at all relevant times, and every opt-in employed on or after May 1, 2014, viewed the

---

[3] All statements in the present tense apply also to all relevant times unless otherwise indicated.

presentation. [Ex. 4]. For example, Mills has viewed the presentation five times (on October 30, 2014; June 18, 2015; April 7, 2016; July 1, 2016; January 1, 2017), and Velazquez viewed it four times (on December 10, 2014; April 15, 2015; December 2, 2016; and January 1, 2017). [Ex. 4 at 4, 18].

**B.** **CCO Uses Computer Timestamps As Of Mid-2016 To Validate CSRs' Self-Reported Time Worked**

In June and July of 2016, GDIT began capturing and using CCO CSRs' computer logon and logoff times.[4] [Ex. 1, ¶22]; [Ex. 3 ¶3]; [Ex. 6] (communications informing CCO CSRs of the June/July 2016 update). These timestamps were compared to the total time the CSRs recorded in ETS, and the CSRs' Supervisors were notified of any variance so they could address it with the CSR and ensure the CSR was paid for all hours worked. [Ex. 1. ¶22]; [Ex. 3, ¶3]. With the introduction of computer login and logout/restart timestamps, it was impossible for an employee to take phone calls, answer e-mails, check his or her calendar, or perform any other work before his or her recorded timestamp. [Ex. 1, ¶22]; [Ex. 3, ¶4].

Plaintiff concedes that off-the-clock work was impossible after the introduction of computer timestamps, and thus agrees to the temporal limit of the proposed class. [Doc. 64, ¶ 30]; [Doc. 89 at 10, 11, 19, 20] (referring to it as the end of the "Material Period").[5] However, neither Plaintiff nor her declarants precisely recall when the upgrade occurred, incorrectly

---

[4] On June 18 and 19, 2016, the upgrade rolled out in Corbin, Kentucky and Coralville, Iowa. On July 16, 2016, it rolled out at all other locations. [Ex. 1, ¶23].

[5] Although the introduction of computer timestamps bears directly on the time period at issue in this matter, it does not – and cannot – establish that what occurred prior to the computer timestamps was unlawful, and to the extent that Plaintiff suggests otherwise, she is misguided. Federal Rule of Evidence 407 excludes evidence of subsequent remedial measures.

estimating between "mid-2016 to mid-2017." [*Id.*].   In fact, it occurred in June/July 2016, as acknowledged by at least one of Plaintiff's declarants.  *See* [Doc. 89-17, ¶¶ 14-15].

In March of 2017, GDIT further refined its timekeeping process so that the timestamps were displayed in a header row in ETS to assist CSRs in filling out their timesheets.[6] [Ex. 1, ¶ 25]; [Ex. 3 ¶5]; [Ex. 7] (communications informing CCO CSRs of the March 2017 update, as well as examples of the login and logout timestamps).

### C.   CCO CSRs Do Not Typically Work Enough Hours Per Week For Any Additional Time To Be Overtime

CCO CSRs do not in general actually work 40 hours (or even 38 or 39 hours) per week, except perhaps during the contract's peak season of Open Enrollment, which only lasts for two to three months.  Frequently CSRs take unpaid, authorized time off, when offered by CCO due to lower than anticipated call volumes.  CSRs also often have unscheduled absences from work.  Evidence can be found with Plaintiff's own declarants. [Ex. 8] (report showing the hours Plaintiff's declarants worked each week from April 10, 2015 through the Material Period, July 22, 2016). As such, the additional worktime claimed by Plaintiff and her Declarants is not necessarily unpaid overtime in violation of the FLSA. The Declarants would be entitled to unpaid overtime for an average of only 32% of the weeks they worked, and often much less.[7] [*Id.*]. For Ykela Hackworth, the statistic is 18%. [*Id.* at 16]. For Lafiera Burr, 16%. [*Id.* at 6]. For James Baker, 17%. [*Id.* at 3].  Thus, determining liability will require factual inquiries

---

[6] The March 2017 update was rolled out at all CCO locations except Coralville, Iowa because it was known at that time that Coralville would be ceasing contact center operations on the CCO contract a couple of months later. [Ex. 1, ¶25].

[7] Plaintiff alleges that each CSR worked off the clock up to twenty minutes per workday, for a total of 100 minutes (1.67 hours) per week. [Doc. 89 at 9]. If true, then CSRs would be entitled to unpaid overtime compensation only for each week in which they worked more than at least 38.33 hours. The calculations above represent the percentage of weeks during which each declarant worked more than 38.33 hours.

specific to each opt-in. As discussed below, this renders the case unsuitable for collective treatment.

III.   **CONDITIONAL CERTIFICATION SHOULD BE DENIED**

    A.   **The Onerous Burdens On The Courts And The Parties Warrant A Meaningful Conditional Certification Standard**

Court-supervised notice is not automatic; it is only appropriate where plaintiffs demonstrate that: (1) there are potential class members who desire to join the lawsuit, (2) the potential class members are similarly situated, and (3) the factual similarities among the plaintiffs are such as to render them manageable as a class and promote the efficient resolution in one proceeding of common issues of law and fact arising from the same alleged activity. *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989); *Haynes v. Singer Co., Inc.*, 696 F.2d 884, 886 (11th Cir. 1983). To make the requisite showings, a plaintiff must offer "detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary." *Grayson v. K-Mart Corp.,* 79 F.3d 1086, 1097 (11th Cir. 1996). "The courts, as well as practicing attorneys, have a responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation. . . . Furthermore, an employer should not be unduly burdened by a frivolous fishing expedition conducted by a plaintiff at the employer's expense." *D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889, 893 (D. Md. 1995) (internal citations omitted); *see also Rodgers v. CVS Pharmacy, Inc.*, 2006 WL 752831, at *2 (M.D. Fla. 2006). "Indeed, federal courts across the Middle and Southern Districts of Florida have routinely denied requests for conditional certification where, as here, the plaintiff[] attempt[s] to certify a broad class based only [on] the conclusory allegations of a few employees." *Kelley v. Taxprep1, Inc.*, No. 5:13-cv-451-Oc-22PRL, 2014 WL 10248251, at *1 (M.D. Fla., Apr. 2, 2014) (Conway, J.).

### B.      Plaintiff's Burden Of Proof Requires A Thorough Analysis

Plaintiff mistakenly argues that on a motion for conditional certification, courts routinely apply a "fairly lenient standard" that "typically results" in conditional certification. [Doc. 89 at 13] (citing *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001)). To the contrary, where, as here, the defendant presents evidence refuting or undermining the plaintiff's allegations, district courts conduct a more thorough conditional certification analysis. *See, e.g.*, *Czopek v. TBC Retail Grp., Inc.*, No. 8:14-CV-675-T-36TBM, 2015 WL 4716230, at *5 (M.D. Fla. Aug. 7, 2015) (Honeywell, J.) (finding that where the court "ha[d] been presented with numerous declarations by both sides," the court should apply a stricter standard and "the evidence presented by all parties should be considered carefully") (citation omitted).

### C.      There Was No Common Unlawful Timekeeping Policy or Practice.

"The key consideration [in conditional certification] is that to be 'similarly situated,' there must be 'substantial allegations that potential members were together the victims of a single decision, policy, or plan.'" *Hart v. JPMorgan Chase Bank, N.A.*, No. 8:12-CV-00470-T-27, 2012 WL 6196035, at *5 (M.D. Fla. Dec. 12, 2012). Here, there was no such policy.

####       1.      Plaintiff's Declarations Do Not Establish A Common Unlawful Timekeeping Policy or Practice As To CCO CSRS

Plaintiff contends that GDIT paid CCO CSRs based on the time they were logged into the Avaya "timekeeping system," which excluded preliminary time spent on other activities. [Doc. 89 at 5, 6].  Her own evidence, however, fails to establish that this was the common policy or practice.  Rather, as Declarant Jocelyn Cayard concedes, CSRs filled out their own timesheets. [Doc. 89-1, ¶ 19] (noting the ETS update that "indicated if the time we *manually*

*inputted into the timesheet* did not match the corresponding computer log-in time"); *see also* [Doc. 89-2, ¶ 17] (mentioning use of timesheets); [Doc. 89-4, ¶ 17] (same). The practice of CSRs themselves recording time worked is confirmed by the CSR job descriptions and Empower scheduling system manual submitted by Plaintiff. [Doc. 89-22 at 3, 6, 9, 12, 15, 18, 21, 24, 27, 30, 33, 35, 39] (job descriptions confirming "[s]pecific [r]esponsibilities [i]nclude . . . [f]illing out timesheets"); [Doc. 89-20 at 10, 21] (referring to ETS timecards and warning that *"[i]t is the employee's own responsibility to ensure that their leave in Empower matches their leave in the ETS timecard"*) (emphasis added).

Plaintiff's declarations are inconsistent as to whether GDIT used Avaya as a "timekeeping system" for compensation purposes. [Doc. 89 at 5]. Many declarants state that GDIT failed to pay them for activities they performed before "clocking in," or allude to a "recorded start time," but they do not explain how their time was recorded or what constituted "clocking in." [Doc. 89-3, ¶¶ 7, 8]; [Doc. 89-7, ¶¶ 7, 10, 11, 14]; [Doc. 89-13, ¶¶ 9, 10]. Two declarants state that they "clock[ed] in" *after* logging into Avaya. [Doc. 89-5, ¶ 7];[8] [Doc. 89-12, ¶ 6].[9] Kathleen Flick states that she "could not clock in *until* [she] logged into GDIT's phone system." [Doc. 89-2, ¶ 7]. Despite Plaintiff's arguments to the contrary, these declarants all recognize that there was a distinction between logging into Avaya and "clocking in." *See also* [Doc. 89-17, ¶ 8].[10]

---

[8] Lafiera Burr states, "GDIT maintained a policy of requiring CSRs to boot up and log-in to their computers and Avaya phone systems *prior to* being able to clock in." [*Id.*] (emphasis added).
[9] Henren Walker states, "GDIT had a policy that required CSRs to read emails, review the calendar, boot up and log-in to the computer, load the essential software programs, and log-in to the phone system *before* actually clocking in." [*Id.*] (emphasis added).
[10] Brandon Peguero alleges that "prior to logging into the phone system *and* officially clocking in for my workday, [he] had to complete certain tasks." (emphasis added).

With no evidentiary support, Plaintiff's declarants also allege that they were required to check emails and consult their calendar off the clock because "GDIT *could* discipline [them] for reading emails and the calendar while on the phone with callers," and "GDIT *could* also discipline [a CSR] for not knowing information contained in those emails." *See, e.g.*, [Doc. 89-2, ¶ 10] (emphases added).  However, no CSRs were actually disciplined for recording time spent checking emails or consulting the calendar. [Ex. 1 at 31]; [Ex. 3, ¶6]. "Subjective beliefs or fear about logging overtime hours [are] insufficient to establish an actual company-wide policy." *See, e.g.*, *Long v. BDP Int'l, Inc.*, No. 4:12-1446, 2013 U.S. Dist. LEXIS 17252, at *16 (S.D. TEx. 6eb. 8, 2013).

Under these circumstances, Plaintiff's declarations should be disregarded as inconsistent and conclusory. *See, e.g.*, *Cartner v. Hewitt Assocs., LLC*, No. 609-CV1293-ORL-31DAB, 2010 WL 1380037, at *3 (M.D. Fla. Mar. 31, 2010) (denying motion to conditionally certify a class of call-center employees because, *inter alia*, "some Plaintiffs swore that the calculation of their pay was based strictly on their scheduled shifts while others swore that they were expected to submit time sheets"); *Bui v. Minority Mobile Systems, Inc.*, No. 15-21317-CIV, 2016 WL 344969, at *7 (S.D. Fla. Jan. 28, 2016) (disregarding FLSA plaintiffs' affidavits submitted in opposition to summary judgment where the affidavits were "conclusory statements completely unsupported by the record. . . . internally inconsistent, and also inconsistent with the record evidence).

2.    **GDIT's Timekeeping Training And Declarations Show The Lack Of A Common Unlawful Timekeeping Policy Or Practice For CCO CSRs**

In stark contrast to Plaintiff's unfounded allegations, GDIT's timekeeping training materials and declarations overwhelmingly demonstrate that GDIT's policy was to require

CSRs to record worktime starting from when they logged onto their computers, not from when they logged onto Avaya. [Ex. 1, ¶30]; [Ex. 3, ¶4]. Starting in March of 2014, all CSRs, including the opt-ins, were required to, and did, view the "Timekeeping 102" presentation at least twice a year. [Ex. 4]. GDIT has submitted declarations from 432 employees confirming these facts.

Against this, Plaintiff mistakenly declares that "courts throughout the Middle District of Florida reject the use of counter-affidavits," and "[t]he Court . . . cannot make credibility determinations or resolve factual issues at this stage."[11] [Doc. 89 at 18]. In fact, the Eleventh Circuit's conditional certification framework presumes that defendants will file counter-affidavits. The court expressly requires plaintiffs to offer "detailed allegations supported by affidavits *which successfully engage defendants' affidavits to the contrary*." *Grayson,* 79 F.3d at 1097 (emphasis added). District courts in this Circuit frequently rely on counter-affidavits to conclude that conditional certification is unwarranted. *See, e.g.*, *Russo v. BellSouth Telecomms., Inc.*, No. 1:07-CV-3054-ODE, 2009 U.S. Dist. LEXIS 20552, at *25 (N.D. Ga. Feb. 10, 2009) (denying conditional certification despite call-center employees' allegation that defendant failed to compensate them for preliminary software bootup where the defendant "submitted substantial evidence to the contrary"); *Cartner*, 2010 WL 1380037, at *2 (same);

---

[11] The cases on which Plaintiff relies for this proposition are distinguishable. In *Palma v. Metropcs Wireless, Inc.*, No. 8:13-cv-698-T-33MAP, 2013 U.S. Dist. LEXIS 175934 (M.D. Fla. Dec. 16, 2013) and *Simpkins v. Pulte Home Corp.*, No. 6:08-cv-130-Orl-19DAB, 2008 U.S. Dist. LEXIS 64270 (M.D. Fla. Aug. 21, 2008), the defendants conceded that the proposed class members were subject to a common policy of being classified as exempt from overtime, and as a result, the declarations the defendants submitted in opposition to conditional certification were not probative. The primary issue in those cases was whether common policy was lawful. In the instant case, by contrast, the primary issue is whether the common policy exists in the first place. On conditional certification, Plaintiff bears the burden of showing that it does. Plaintiff also cites *Robinson*, 2011 U.S. Dist. 147027, and it, too, is distinguishable for the reasons stated above. *See* page 15, *supra*.

*see also Gaffers v. Sitel Worldwide Corp.*, No. 3-16-0128, 2016 U.S. Dist. LEXIS 74321, at *8 (M.D. Tenn. June 6, 2016) (same).

Courts have repeatedly and consistently denied conditional certification to call-center employees who allege off-the-clock work where the challenged practice runs counter to the employer's stated policy, such that the plaintiff cannot show that the work was undertaken pursuant to a common unlawful company policy or practice. *See, e.g.*, *Russo*, 2009 U.S. Dist. LEXIS 20552, at *25 (denying motion to conditionally certify class of call-center employees who alleged that defendant failed to compensate them for time logging into their computers and to essential software applications prior to taking calls, where "the defendant submitted substantial evidence" that it maintained a lawful compensation policy, and "[t]he most that Plaintiffs' evidence show[ed] [wa]s that a few supervisors may have failed to follow company policy or that there were varying levels of understanding amongst employees regarding company policy"); *Cartner, LLC*, 2010 WL 1380037, at *5-*7   (denying motion to conditionally certify class of call-center employees who alleged that defendant did not pay them for preliminary worktime required to "boot up their computers, and login to various software applications" where defendant presented evidence that (1) "it prohibit[ed] [employees] from performing any off-the-clock work," (2) their "pay [wa]s based on the time cards that they submit[ted]—not by their scheduled hours or the time logged on Defendant's phone system," and (3) "[w]hen [employee]s work[ed] prior to or after their shifts, they [we]re instructed to include that extra work on their time cards"); *Gaffers*, at *8 (denying conditional certification of putative class of "home-based customer care agent[s]" who alleged that they were not compensated for "work performed at the beginning of each shift in connection with

11

the starting and logging into various computer programs and applications . . . and work performed after each shift in connection with shutting down and logging off various computer programs and applications," where the evidence showed that defendant maintained official policies dictating a contrary result, and the plaintiffs identified no common "directive from Defendants to violate the existing policy, or any practice of Defendants' changing Plaintiff's time worked to deduct such activities," or that "Defendants' management instituted a policy or practice to ignore the written policies").

### 3.      The Lack Of Common Evidence Results In Individualized Inquiries

Conditional certification is not appropriate where, as here, the plaintiff cannot rely on common evidence to establish liability or damages at trial. *See Trinh v. JP Morgan Chase & Co.*, 2008 WL 1860161, at *4, *5 (S.D. Cal. Apr. 22, 2008) (refusing to certify a collective action in the absence of common evidence); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1272-75 (M.D. Ala. 2004) (same); *Jones v. Xerox Commer. Sols., LLC*, No. 4:13-cv-650, 2013 U.S. Dist. LEXIS 158793, at *19 (S.D. Tex. Nov. 6, 2013) (denying conditional certification where the plaintiffs had "not produced evidence to suggest that Defendant has instituted a Texas-wide policy, written or otherwise, to deny call-center employees pay for time recorded in certain Aux Work modes or for time spent during a system failure"). The mere fact that violations are alleged with respect to a handful of employees "[is not] enough to establish similarity, as that would not ultimately be sufficient to establish a pattern and practice without a showing that the violations were more than sporadic occurrences." *Marsh v. Butler Co. Sch. Sys.*, 242 F. Supp. 2d 1086, 1094 (M.D. Ala. 2003).

For example, in *Williams v. Accredited Home Lenders, Inc.*, No. 1:05-CV-1681-TWT, 2006 U.S. Dist. LEXIS 50653, at **15-16 (M.D. Ga. July 25, 2006), the Court declined conditional certification, concluding it was not appropriate because it would be "utterly unmanageable."  Explaining its decision, the Court stated:

> The Plaintiffs propose to prove hundreds of small overtime claims by [comparing] 'computer activity reports, date and time stamped email, and phone records proving that Plaintiffs were working before and after the times recorded on their timesheets.' . . . Presumably, this must be done for hundreds of loan officers for every day for a two year period. The cost to the parties of the discovery required to prepare for this is mind-boggling. The waste of scarce judicial resources of conducting such a trial would be unconscionable. The proposed collective action does not permit the efficient resolution in one proceeding of common issues of law and fact arising from the same alleged activity.

*Id.*

Based on the extensive policies, training and timestamp tools, addressed *supra* pages 3-5, the evidence in this case shows, at most, that a small minority of CSRs were mistaken about how to record their time, and their misunderstanding can be traced to a handful of rogue Supervisors who allegedly directed them not to record small amounts of time at the beginning or end of their shifts.  If certified, this action would certainly degenerate into individualized inquiries at trial. Every plaintiff would have to testify about: (1) whether he or she logged onto the computer or the telephone first[12] and why; (2) his or her awareness, or lack thereof, of the GDIT's total time recording and overtime policies; (3) the manner in which he or she violated those policies; (4) whether such violations were compelled by his or her Supervisor; (5)

---

[12] Despite Plaintiff's assertion that CSRs logged into Avaya through a computer program, CSRs could and often did log directly into Avaya as soon as they arrived at their workstation by entering a personal code on their telephone's touchpad.

TPA 512460514v14

whether GDIT knew or should have known of the unreported time; and/or (6) whether he or she actually worked sufficient time in that workweek for any additional time to be considered overtime.[13]

Each plaintiff would then have to prove the amount of uncompensated overtime based on personal, anecdotal evidence or a day-by-day comparison of timesheet records and Avaya or other time data. The Court would ultimately be required to determine whether each individual plaintiff's uncompensated time was *de minimis*. On such facts, courts have denied conditional certification. *See, e.g.*, *Hart*, 2012 WL 6196035, at *5 (denying motion to conditionally certify a class of call-center employees because "specific inquiries would be required as to numerous issues including, *inter alia,* whether plaintiffs actually worked 'off the clock,' whether plaintiffs modified their time records to reflect the actual time worked, whether plaintiffs' supervisors were aware of any 'off-the-clock' work . . . and whether any 'off-the-clock' work fell within the *de minimis* exception to the FLSA.").

### 4.    Plaintiff's Cited Cases Are Inapplicable

The cases relied upon by Plaintiff to support conditional certification are inapplicable because in none of the cases did the employer provide extensive timekeeping training to employees, directing them as to what specifically constituted work time that had to be recorded, as GDIT did long before and throughout the limitations period of this action.  The cases are also distinguishable because they involved a common unlawful policy or practice.

---

[13] As explained above, CCO CSRs rarely worked enough hours in a workweek to be entitled to unpaid overtime for any additional uncompensated time worked.  *See supra at 5.*  Courts have denied conditional certification where, as here, liability cannot be established without "week-by-week and other periodic calculations. . . specific to each Plaintiff and his or her particular circumstances . . . ." *See, e.g., Tussing v. Quality Res., Inc.*, No. 8:09-CV-1833-T-26AEP, 2009 WL 4350253, at *6 (M.D. Fla. Nov. 25, 2009).

*See, e.g.*, *Peterson v. Nelnet Diversified Sols., Ltd. Liab. Co.*, Civil Action No. 17-cv-01064-NYW, 2018 U.S. Dist. LEXIS 69256, at *25, *26 (D. Colo. Apr. 25, 2018) (certifying a class of call-center employees where employer's corporate representative admitted in deposition that employer's timekeeping system automatically excluded pre-shift time employees spent booting up computers and logging into essential software programs); *Jewell v. Aaron's, Inc.*, No. 1:12-CV-0563-AT, 2012 U.S. Dist. LEXIS 92285 (N.D. Ga. June 28, 2012) (certifying class of call-center employees where, although defendant had "formal policy" requiring payment for all hours worked, defendant maintained "conflicting polic[y]" of understaffing stores while keeping sales requirements high, forcing employees to work through unpaid meal breaks).

The cases are distinguishable for additional reasons as well. For example, *Robinson v. Ryla Teleservices, Inc.*, No. CA 11-131-KD-C, 2011 U.S. Dist. LEXIS 147027 (S.D. Ala. Dec. 20, 2011) is not persuasive because its description of the overtime work at issue is too vague to allow for meaningful comparison with the instant case. In *Kerce v. W. Telemarketing Corp.*, 575 F. Supp. 2d 1354 (S.D. Ga. 2008), the primary issue was whether class members were misclassified, not whether they worked off the clock. *Id.* at 1359. While the plaintiff did allege that she engaged in "off-the-clock document review," the defendant essentially conceded the point, submitting declarations that "generally support[ed] [the plaintiff's] claim that she had to review materials from [the defendant] without pay" and "that this practice was widespread." *Id.* at 1362, 1363.

15

### D.    Plaintiff Has Not Shown Sufficient Interest In Joining This Lawsuit

"[C]ourts, as well as practicing attorneys, have a responsibility to avoid the stirring up of litigation through unwarranted solicitation." *Holt*, 333 F. Supp. at 1275 (internal quotation marks and citations omitted). Accordingly, "certification of a collective action and notice to a potential class is not appropriate to determine *whether* there are others who desire to join the lawsuit." *White v. Kcpar, Inc.*, No. 605CV1317ORL22DAB, 2006 WL 1722348, at *3 (M.D. Fla. June 20, 2006) (emphasis added). Although there is no uniform formula that provides a minimum number of opt-ins and affidavits necessary to sustain a motion for conditional certification, it is clear that the larger or more varied the proposed class, the more evidence is required. *See Kubiak v. S.W. Cowboy, Inc.*, No. 312-CV-1306-J-34JRK, 2014 WL 2625181, at *20 (M.D. Fla. June 12, 2014) (collecting cases, especially in footnote 26). In the instant case, Plaintiff has filed 142 consents to join[14] and submitted declarations from 18 employees at seven of GDIT's thirteen CCO call centers.[15] [Ex. 1, ¶9]; [Ex. 2]. For five of those call centers,

---

[14] In fact, plaintiff filed 159 notices of consent to join as of August 30, 2018, but three are duplicates. *Compare* [Doc. 85-1] (Consuelo Concepcion), *with* [Doc. 83-1] (Concuelo Concepcion); *compare* [Doc. 24-17] (Precious Longmire), *with* [Doc. 51-1] (Precious Longmire); *compare* [Doc. 74-2] (Corlaysha Wilson), *with* [Doc. 79-3] (Corlaysha Wilson). At least three of the opt-ins—Maria T. Rodriguez, Patricia Bailey, and Jeremaine Smith— did not work for GDIT in any capacity. [Ex. 1 at ¶33]. Seven opt-ins were Quality Monitors or Supervisors, not CSRs, so they do not fall within the scope of the proposed class. [*Id.*]. These include Steven Skinner, Felicia Cargill, Maria M. Salinas, Andra M. Quiram, Mary Scott, Jocelyn Cayard, and Consuelo M. Concepcion. [Ex. 2]. Four of the opt-ins' claims are time-barred because they separated from employment with GDIT before April 10, 2015. These include Teresa Fulton, Karizma D. Minnitt, Meghan McGuire, and Carolyn Johnson Denver. [Ex. 2]. While GDIT never in fact employed anyone named Carolyn Johnson Denver, GDIT presumes this opt-in is in fact Carolyn D. Johnson, who separated from employment with GDIT on April 26, 2014. [Ex. 2]. Six opt-ins have claims falling outside of the presumed two-year statute of limitations and would therefore be required to demonstrate that GDIT willfully violated the FLSA. [Ex. 2]; *see Hart v. JPMorgan Chase Bank, N.A.*, No. 8:12-CV-00470-T-27, 2012 WL 6196035, at *2 (M.D. Fla. Dec. 12, 2012) (citing this as a basis for denying conditional certification).

[15] CCO currently operates in the following ten locations: (1) Riverview, Florida; (2) Lynn Haven, Florida; (3) Phoenix, Arizona; (4) Sandy, Utah; (5) Bogalusa, Louisiana; (6) Hattiesburg, Mississippi; (7) Lawrence, Kansas; (8) Chester, Virginia; (9) London, Kentucky; and (10) Winchester, Kentucky. [Ex. 1, ¶9]. GDIT previously operated CCO call centers in Waco, Texas and Coralville, Iowa until May 31, 2017, and a CCO call center in

Plaintiff has submitted the declarations of only one or two CCO employees. [*Id.*] In contrast, GDIT at any given time employs approximately 9,500 CCO CSRs. [Ex. 1, ¶15]. In other words, Plaintiff has filed consents to join of only 1.39% of GDIT's CCO CSR workforce, and filed declarations of only 0.002% of GDIT's CCO workforce.[16] Courts have found that such a ratio is insufficient to show that there exist similarly situated employees who desire to opt in. *See, e.g., Hart*, 2012 WL 6196035, at *4 (denying conditional certification where plaintiff submitted three declarations in support, while defendant submitted "nearly sixty" declarations of "putative class members attesting that they [we]re not interested in joining this lawsuit . . . .") (collecting cases, especially in footnote 12); *Harrison v. McDonald's Corp.,* 411 F.Supp.2d 862, 870–71 (S.D.Ohio 2005) (averments from two (2) employees who claimed FLSA violations, out of a potential class of 300, were insufficient to allow for conditional certification); *Czopek*, 2015 WL 4716230, at *7 (Honeywell, J.) (entertaining defendant's argument that plaintiffs had not shown enough interest where plaintiffs submitted consents to join of "less than 1% of the proposed class (35/6600 = 0.53%)," and rejecting the argument in part because the defendants themselves submitted counter-declarations that were "still less than 1% of the proposed class (59/6600 = 0.89%)," and also because the Court imposed "geographic limitations" limiting the size of the proposed class to "substantially less than 6,600 people, making Plaintiffs' percentage more substantial").

There is not even a named plaintiff who works or worked in the Middle District of Florida. Mills, the Riverview CSR whose name appears in the caption of this case, has

---

Corbin, Kentucky, which was recently consolidated in April and May 2018 with the London, Kentucky location. [Ex. 1, ¶10].

[16] In contrast, GDIT has submitted 432 supporting declarations, which is more than three times greater than the number of Plaintiff's opt-in consents.

indicated that she is no longer interested in participating in this lawsuit, and Plaintiff has not

submitted any declarations from any of the CSRs who worked here. [Doc. 86 at 2, 3]. To date,

opposing counsel has yet to find an alternative plaintiff whose substitution will not require

dismissal of this action for improper venue. [Doc. 97]. At the very least, the Court should not

allow notice to issue to the six CCO call centers for which Plaintiff filed no declarations.[17]

## IV.   THE PROPOSED NOTICE IS NOT FAIR OR ACCURATE

Even if Plaintiff could carry her burden and the Court chooses to authorize notice to

potential plaintiffs, Plaintiff's proposed Notice and Consent to Join are inappropriate. As this

Court has explained,

> Court-authorized notice in a class action context helps to prevent misleading
> communications, and ensures that the notice is timely, accurate, and
> informative. . . . In the exercise of its discretion, the court should screen the
> proposed notice to prevent potential plaintiffs from receiving information
> which is factually inaccurate, unbalanced, or misleading.

*Czopek*, 2015 WL 4716230, at *10 (Honeywell, J.) (citations and quotation marks omitted). In

the instant case, the Proposed Notice would be improper for ten reasons.

First, in calculating the temporal scope of the proposed class, Plaintiff counts three

years back from the date the original complaint was filed, when in fact "the proper date from

which to set the temporal scope is the date on which [the Order granting conditional

certification] is entered." *Peterson*, 2018 U.S. Dist. LEXIS 69256, at *43 (collecting cases).

Second, the temporal scope of the proposed class extends until July 31, 2017, based on

Plaintiff's mistaken belief that GDIT upgraded its timekeeping system on that date, when in

---

[17] These include: (1) Riverview, FL; (2) Phoenix, Arizona; (3) Sandy, Utah; (4) Chester, Virginia; (5) Winchester, Kentucky; or (6) Corbin, Kentucky.

fact the date was June/July of 2016. [Ex. 1, ¶22]. Third, the phrase "Court-Authorized" in the heading of the Proposed Notice improperly suggests judicial approval of Plaintiff's claims. *See generally, Czopek*, 2015 WL 4716230, at \*11 (Honeywell, J.) (collecting cases). Fourth, the Notice includes the sentence, "Over \_\_\_ other Customer Service Representatives have joined the case to date." That sentence exceeds the requirements needed to apprise potential class members of their right to opt into this litigation and improperly suggests that Plaintiff's claim is meritorious. Fifth, Plaintiff proposes sending out a reminder notice, which courts have declined to do as it can reasonably "be interpreted as encouragement by the Court to join the lawsuit." *Anish v. Nat'l Sec. Corp.*, 2012 U.S. Dist. LEXIS 12075, at \*5-6 (S.D. Fla. Feb. 1, 2012). Sixth, Plaintiff proposes communication by e-mail, which courts have found inappropriate unless US Mail is returned as undeliverable. *See Sutton v. Singh,* 2013 U.S. Dist. LEXIS 81162 (M.D. Fla. 2013) (holding that serving notice by US Mail is appropriate with a sixty-day notice period, and then if the notice is returned to sender as undeliverable, the parties exchange additional contact information (including email)). Seventh, the Notice and "Reminder Postcard" make reference to a collective-action website. The Court should not authorize the creation of a collective-action website without being apprised of what information the website will contain. *See Czopek*, 2015 WL 4716230, at \*10 (Honeywell, J.). Eighth, the Notice does not explain that potential plaintiffs may be liable for costs and fees if they lose. *Id.* at \*11. (collecting cases). Ninth, the Notice does not explain that if the potential plaintiffs join, they may have to respond to discovery requests and travel to the Middle District of Florida to sit for deposition or testify at trial. *Id.* Tenth, the Notice does not mention that the potential plaintiffs are entitled to select any counsel of their choosing.

*TPA 512460514v14*

## V.     <u>CONCLUSION</u>

**WHEREFORE**, GDIT respectfully requests that the Court issue an order denying Plaintiff's Motion to Conditionally Certify an FLSA Collective Action and Authorize Notice. In the alternative, if the Court grants conditional certification, GDIT requests that the Court issue an order requiring Plaintiff to confer with GDIT to amend the Proposed Notice, and, if the parties cannot agree on the form thereof, to submit the matter to the Court.

Dated:  August 31, 2018

Respectfully submitted,

/s/*Gregory W. Kehoe*
Gregory W. Kehoe, Esq.
Florida Bar No. 0486140
Email: kehoeg@gtlaw.com
Catherine H. Molloy, Esq.
Florida Bar No. 0033500
Tristan
Email: molloyk@gtlaw.com
GREENBERG TRAURIG, P.A.
101 E. Kennedy Boulevard, Suite 1900
Tampa, FL  33602
(813) 318-5700 – Telephone
(813) 318-5900 – Facsimile

and

Christine E. Howard, Esq.
Florida Bar No. 872229
Email:  choward@laborlawyers.com
FISHER PHILLIPS LLP
101 E. Kennedy Blvd., Suite 2350
Tampa, FL 33602
(813) 769-7500 – Telephone
(813) 769-7501 – Facsimile

Attorneys for Defendants

*TPA 512460514v14*

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of August, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Gregg I. Shavitz
gshavitz@shavitzlaw.com
Logan A. Pardell
lpardell@shavitzlaw.com
SHAVITZ LAW GROUP, P.A.
1515 South Federal Highway, Suite 404
Boca Raton, Florida 33432

Michael J. Palitz
mpalitz@shavitzlaw.com
SHAVITZ LAW GROUP, P.A.
830 3rd Avenue, 5th Floor
New York, New York 10022

Troy Kessler
tkessler@shulmankessler.com
Garrett Kaske
gkaske@shulmankessler.com
Tana Forrester
toforrester@shulmankessler.com
SHULMAN KESSLER LLP
534 Broadhollow Road, Suite 275
Melville, New York 11747

/s/*Gregory W. Kehoe*
Attorney

21